(No. 51608

*In re* LUIS KUTNER, Attorney, Respondent.

*Opinion filed October 19, 1979.—Rehearing denied February 1, 1980.*

KLUCZYNSKI, J., took no part.
CLARK, J., dissenting.

John C. O'Malley, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Steven Ackerman, of Chicago, for respondent.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

On July 7, 1976, the Administrator of the Attorney Registration and Disciplinary Commission filed a complaint charging the respondent, Luis Kutner, with unprofessional conduct. The complaint alleged that respondent was guilty of overreaching, the use of a *curriculum vitae* to induce the payment of an excessive fee, and charging an excessive fee in violation of Disciplinary Rule 2—106 of the Illinois Code of Professional Responsibility (1970) (DR 2—106).

On June 1, 1977, the Hearing Board recommended that the motion of the respondent for a directed finding at the close of the Administrator's case be sustained due to the lack of evidence concerning the propriety of the fee charged. On June 24, 1977, however, the Review Board reversed the Hearing Board, finding that the Administrator had established a *prima facie* case by competent, credible evidence. The cause was remanded to the Hearing Board for further proceedings. Following prolonged hearings, the Hearing Board on June 27, 1978, filed its report and recommendation, concluding that respondent violated DR 2—106 by charging an excessive fee, but that the use of the *curriculum vitae* "did not have any determining influence on Warren Fisher" and was not "a matter warranting discipline." The Hearing Board unanimously recommended that the Review Board impose a private reprimand as provided by Rule 10.4 of the Rules of the Attorney

Registration and Disciplinary Commission. (Ill. Rev. Stat. 1975, ch. 110A, following par. 770, Rule 10.4, Rules of the Attorney Registration and Disciplinary Commission.) On December 20, 1978, the Review Board issued its report and recommendation, in which it was determined that the appropriate measure of discipline for violation of DR 2—106 should be censure of respondent by this court. This disciplinary action comes before us on respondent's exceptions to the report and recommendation of the Review Board.

On August 14, 1973, the complainant, Warren P. Fisher, was arrested in Glencoe and charged with battery by his sister-in-law, Ruth Fisher. Fisher testified that he and his wife were living temporarily in a home owned by his brother and sister-in-law while they awaited completion of a condominium which they had purchased. At about midnight, Ruth Fisher came in the house, went into the bedroom and ordered Warren Fisher and his wife out of the house. According to his testimony, Ruth was an alcoholic and at the time of her entry that night she appeared to be quite intoxicated. When he escorted her out of the bedroom, she threatened to call the police. Sometime later, the police arrived and arrested him for battery.

Upon his mother's recommendation, Fisher called respondent and they arranged a meeting to discuss the case. On August 28, 1973, respondent met with him and told him that he would represent him in the defense of the criminal battery charge for $5,000. An additional fee for representation of Fisher in a possible civil suit was also mentioned. At this time, respondent provided him with a collage of clippings concerning respondent's achievements, although respondent argues that these materials were given to Fisher only after he had requested them. Fisher paid the respondent $250 as an initial consultation fee, but indicated that he could not afford to pay the balance of the $5,000 fee. Respondent testified that he then con-

sidered the Fisher file closed. However, a few days later, after managing to borrow the additional money, Fisher contacted respondent and advised him that he would send a check for the balance due, $4,750.

Subsequently, Fisher and respondent met to discuss the details of the case. At this second meeting, respondent asked Fisher to provide him with a written summary detailing the facts of the encounter with his sister-in-law. Respondent also discussed further the possibility of a civil suit against the Glencoe police. On September 4, 1973, one day prior to Fisher's court date, respondent called Fisher and advised him that he would not be able to meet Fisher in court and that he was sending attorney Gorman in his place. Fisher was instructed by respondent not to tell Gorman how much respondent was paid to take the case. On the 5th, Fisher met Gorman in the courtroom. When the attorney approached the bench to request a continuance, the complainant, Ruth Fisher, stepped up and asked the judge to drop the charges. The case was then dismissed.

Afterwards, Fisher consulted two attorneys, each of whom advised him that the fee which he had paid respondent was excessive. On October 25, 1973, Fisher wrote a letter to respondent requesting the refund of $4,000, the amount by which Fisher considered he was overcharged. Respondent, however, refused to return any portion of the fee paid by Fisher, who then contacted the Chicago Bar Association. The matter was referred to the Committee on Professional Fees, which initiated steps toward settlement. While Fisher agreed to submit the dispute to binding arbitration, respondent refused. Respondent did, following remand by the Review Board, offer to settle the matter by refunding $1,000.

In his appearances before the Hearing Board, respondent testified at length as to his accomplishments in the legal profession, particularly in international matters and civil rights. He has been practicing law for nearly 49 years,

and much of his practice throughout those years has been devoted to *pro bono publico* work. The Hearing Board found that respondent has received many citations praising his work in those fields and that he is the author of a number of law-review and other articles. However, notwithstanding respondent's achievements in the field of civil rights and international law, there is no evidence that respondent had any extensive experience with, or particular expertise in, the defense of routine criminal cases such as the one involving Fisher, particularly in recent years.

Respondent's argument, as we interpret it, is that attorney-client fixed-fee agreements, when freely entered into, are not subject to scrutiny by a disciplinary committee and may not form the basis for disciplinary action against an attorney. Rather, respondent contends that any dispute over a fixed fee must be resolved based on traditional contract principles in a court of law. In support of this argument, respondent cites *Sokol v. Mortimer* (1967), 81 Ill. App. 2d 55. The *Sokol* case, however, is inapposite. It merely stands for the proposition that attorney-client fee arrangements are not presumptively fraudulent. The court in *Sokol* simply restated what has been the law in Illinois at least since 1893, when this court decided *Rolfe v. Rich* (1893), 149 Ill. 436. In *Rolfe,* the court stated:

> "While the law is, that dealings between attorney and client, resulting in advantage to the former, will be closely scrutinized, and the attorney be required to show the utmost good faith and fairness, and that the client dealt with full knowledge of his rights, it does not prohibit all dealings between them, or declare all contracts made by the attorney with the client *ipso facto* void, or voidable at the instance of the client." 149 Ill. 436, 437.

The Supreme Court of Washington faced a similar argument in the case of *In re Greer* (1963), 61 Wash. 2d

741, 380 P.2d 482. In response to the respondent's contention that the issue of reasonableness of fees is a problem for the civil courts and ought not to form the basis for a disciplinary proceeding, the Washington Supreme Court stated:

> "While a determination that a fee is reasonable or unreasonable is appropriate only to a civil court, where the fee retained or demanded can be considered to be unconscionable, it is a matter for a disciplinary proceeding. \*\*\*
>
> \*\*\*
>
> \*\*\* When the courts use the expression 'unconscionable' in classifying a fee, we think they mean an amount under the circumstances which neither lawyer nor client can sensibly argue to be otherwise." (61 Wash. 2d 741, 749-50, 380 P.2d 482, 486-87.)

The court further noted:

> "Where \*\*\* ethical considerations take us from one end of the spectrum marked 'reasonable' through categories designated successively as unreasonable, excessive, immoderate, inordinate, exorbitant, and unconscionable, we move in a direct line from the civil arena into a disciplinary forum." (61 Wash. 2d 741, 750, 380 P.2d 482, 487.)

Similarly, the California Supreme Court has stated:

> "It is settled that gross overcharge of a fee by an attorney may warrant discipline. The test is whether the fee is ' "so exorbitant and wholly disproportionate to the services performed as to shock the conscience." ' " *Bushman v. State Bar of California* (1974), 11 Cal. 3d 558, 563, 522 P.2d 312, 314, 113 Cal. Rptr. 904, 906.

We find the reasoning employed in *Greer* and *Bushman* persuasive and agree that, where there is an unconscionable fee fixed in an attorney-client agreement, the

matter is subject to action by the Attorney Registration and Disciplinary Commission.

Additionally, DR 2—106 of the Code of Professional Responsibility (1970), which has been adopted by the board of governors of the Illinois State Bar Association and the board of managers of the Chicago Bar Association, subjects a lawyer to disciplinary action for collection of an "excessive fee." As we have stated frequently, although such canons of ethics may not be binding on this court, "they constitute a safe guide for professional conduct and an attorney may be disciplined for not observing them." (*In re Krasner* (1965), 32 Ill. 2d 121, 129. See also *In re Taylor* (1977), 66 Ill. 2d 567, 571; *In re Broverman* (1968), 40 Ill. 2d 302, 306.) DR 2—106 provides in pertinent part:

"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or excessive fee.

(B) A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

It is our function to determine whether respondent's receipt of a $5,000 fee for representation of Fisher in his battery case constitutes collection of an excessive fee under DR 2—106, thereby warranting disciplinary sanctions against respondent. In an apt statement with which we agree, the Florida Supreme Court, in considering a similar question, noted: "Few, if any, areas of attorney discipline are as subject to differing interpretations as the matter of what constitutes an excessive attorney's fee." (*The Florida Bar v. Moriber* (Fla. 1975), 314 So. 2d 145, 148.) Nevertheless, we are convinced that the circumstances of this case leave no room for doubt that the fee charged was clearly excessive.

The administrator presented the expert testimony of Sherman Magidson, an attorney licensed in 1959 and an experienced practitioner in the field of criminal law. He testified, in response to a hypothetical question which set forth all of the relevant facts, that the fee customarily charged for representation of a client in Fisher's position, assuming it would be necessary to go to trial to defend the battery charge, would be between $750 and $1,250. He testified further that in the event of dismissal of the criminal charge prior to trial, as in the Fisher case, the customary practice is to return a portion of the fixed fee to the client. Magidson further testified that Fisher's case did not appear to be a novel one, that there were no complex legal issues involved, that it did not present unusual time or labor requirements, and that the acceptance of this case would not preclude other employment by the attorney.

The Hearing Board concluded that respondent spent between 5 and 6 hours on Fisher's case, while respondent estimated his total time commitment at approximately 10 hours. Respondent stressed, however, that he did not want this disciplinary action resolved by computing a reasonable fee on an hourly basis. Rather, respondent seeks to rely on, as he refers to it, the "law of fixed fees." However,

even a cursory reading of DR 2—106 leads one to the inescapable conclusion that the time required to perform a legal task is a factor to consider in attempting to determine whether a fee is excessive. Even conceding that respondent spent 10 hours on the case, respondent was paid at a rate of $500 per hour.

Considering the time and labor expended, the fee customarily charged, and all of the other elements of DR 2—106, we find a $5,000 fee for representation of Fisher in a routine battery case which never went to trial not only excessive, but unconscionable. We cannot accept respondent's description of the Fisher case as an extraordinary one for which "an involved, unique preparation would be necessary." Rather, we concur in the Hearing Board's characterization of it as a "simple battery case." Furthermore, respondent's arguments that DR 2—106 is unconstitutionally vague or that the disciplinary proceedings herein were tainted by prosecutorial misconduct do not merit discussion.

Accordingly, we agree with the conclusion of the Hearing Board and the Review Board that respondent's conduct in this matter violated DR 2—106 and warrants discipline. Taking into consideration the fact that respondent has practiced law for nearly 50 years during which he has engaged in many *pro bono publico* activities, together with the absence of any other disciplinary complaints, we believe that censure by this court is the appropriate sanction to impose.

*Respondent censured.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, dissenting:

I must dissent because I think the majority is venturing into troubled waters when it begins to assess the value of a lawyer's services for the purpose of imposing

disciplinary sanctions. It is quite within the sphere of proper judicial activity to set legal fees as part of punitive damages, or to approve a fee as reasonable in dissolution-of-marriage or probate cases. It is quite another matter, however, when we hold that an attorney has charged an excessive fee and publicly censure him for so doing. The majority has engaged in a subjective process in which it places an arbitrary value on legal services, thereby voiding a valid agreement, based on a code which is not binding upon this court. I would urge that before we besmirch a lawyer's record of 49 years, which includes a considerable amount of *pro bono publico* work, we have a firmer basis for doing so than that which exists here.

The majority fails to realize that its opinion says that a lawyer can voluntarily enter into an agreement with a client, based on the mutual agreement of the parties as to the worth of the attorney's services, only to be second-guessed later on.

The majority overlooks what was in the contemplation of the parties at the time they entered into the fee agreement. Fisher needed legal representation surely, but there is nothing in the record to indicate that his need was urgent or that he was desperate to obtain counsel on that day. Therefore he could have rejected respondent's offer and sought other counsel. However, Fisher insisted on retaining respondent, based in part on the recommendation made by Fisher's own mother. The point is that Fisher thought he was getting fair value for his money since respondent had a favorable reputation and 49 years of experience. While it is our duty to scrutinize lawyer-client dealings where an injustice has been done, I do not think we should pierce the veil of lawyer-client relations where no fraud or other wrongdoing has been shown. A client who voluntarily agrees to pay what he thinks a lawyer's services are worth should not be heard to complain when, after the lawyer has begun to prepare the case, the charges are dismissed. My opinion might be

different had coercion, overreaching or deception been shown here. But those elements simply are not present.

An additional ground for my disagreement with the majority opinion is its reliance upon the Code of Professional Responsibility. We have, as the majority opinion notes, repeatedly asserted that the Code is not binding upon the court but serves only as a guide. (*In re Taylor* (1977), 66 Ill. 2d 567, 571; *In re Heirich* (1956), 10 Ill. 2d 357, 387.) I would think, however, that in so controversial an area as attorneys' fees, where one's fee is dependent upon so many subjective factors, we should be chary about imposing sanctions pursuant to a code which has no legal effect in Illinois. There are times when the Code proscribes conduct which clearly should be forbidden. It is in those kinds of cases that we should apply the Code. But where, as here, the infraction is subject to varying interpretation, we should not impose sanctions without a clear and binding directive, either by rule or statute.

Moreover, it is my belief that the court today has embarked on a path which contravenes the United States Supreme Court's decision in *Goldfarb v. Virginia State Bar* (1975), 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004. The court proscribed the formulation of minimum fee schedules as violative of section 1 of the Sherman Act (15 U.S.C. sec. 1 (1970)). The reason behind that decision was that minimum fee schedules constituted an anticompetitive system in restraint of trade. (421 U.S. 773, 792, 44 L. Ed. 2d 572, 587, 95 S. Ct. 2004, 2015.) I think the same can be said of the effect the majority opinion may have. By finding an attorney's fee to be excessive, the majority is imposing an artificial ceiling on fees, rather than permitting the forces of the marketplace to determine what a fee should be. The Supreme Court has found that the legal profession, at least with regard to fees, is analogous to any other business. (421 U.S. 773, 787, 44 L. Ed. 2d 572, 585, 95 S. Ct. 2004, 2013.) Thus I think it is not our place to interfere with the workings of the legal marketplace in the

absence of wrongdoing or illegality, the same way as it is not our place to interfere with the workings of the remainder of the commercial marketplace. We should instead allow the marketplace to find its own level. It might be argued that this case is distinguishable because *Goldfarb* holds that the State bar, as an arm of the Virginia Supreme Court, could not promulgate fee schedules which tended to raise the cost of legal services, while this case attempts to limit the cost of legal services. But that comparison is not borne out by the opinion in *Goldfarb*. There it was stated:

> "Nor was it necessary for petitioners to prove that the fee schedule raised fees. Petitioners clearly proved that the fee schedule fixed fees and thus 'deprive[d] purchasers or consumers of the advantages which they derive from free competition.' [Citations.]" (421 U.S. 773, 785, 44 L. Ed. 2d 572, 584, 95 S. Ct. 2004, 2012.)

Therefore it is not the effect of price fixing which the court held to be illegal, but the anticompetitive practice of deciding what a fee should be, even if the fee set down was a reasonable one. Price fixing is illegal *per se* under the Sherman Act whether the prices fixed are reasonable or not. *United States v. Socony-Vacuum Oil Co.* (1939), 310 U.S. 150, 218, 84 L. Ed. 1129, 1165, 60 S. Ct. 811, 842.

While it is true that the majority, as a branch of the State government, is exempt from the provisions of the Sherman Act (*Bates v. State Bar* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691), I think there can be no question but that the majority, in attempting to define what is a reasonable fee as opposed to an excessive one, is in fact engaging in an anticompetitive practice. Instead, I agree with Mr. Chief Justice Burger's statement in his dissent in *Bates* which, while addressing price advertising, has equal applicability to price fixing:

> "[L]egal services *** by necessity, must vary greatly from case to case. Indeed, I find it

difficult, if not impossible, to identify categories of legal problems or services which are fungible in nature. *** A 'reasonable charge' for [an uncontested] divorce could be $195, as the appellants wish to advertise, or it could reasonably be a great deal more, depending on such variables as child custody, alimony, support, or any property settlement. Because legal services can rarely, if ever, be 'standardized' and because potential clients rarely know in advance what services they do in fact need, price advertising can never give the public an accurate picture on which to base its selection of an attorney." 433 U.S. 350, 386, 53 L. Ed. 2d 810, 838, 97 S. Ct. 2691, 2710.

I would suggest that it is not our function to delve into what is a reasonable fee in a given case precisely because no case is "standard." The negotiation of a fee should be left to the parties. A person may be willing to pay more for the services of a particular attorney at a particular time, when, however, under different circumstances, the attorney's services would not be as valuable. In this connection the question may be asked whether the fee in this case would be excessive if the attorney involved were a nationally famous criminal lawyer? Or, would the fee be considered excessive if a corporate client retained an attorney because of his reputation as an aggressive advocate, and the case was settled shortly thereafter? I doubt it, because the attorney would argue that since he was ready, willing and able to perform, he had performed his part of the agreement and was entitled to keep the retainer. The result should not differ here, simply because the respondent does not possess a reputation as "high-powered" and the case involved a simple battery. I do not think it is appropriate for the court to rate one attorney's worth over another's, which is precisely what this case sets a precedent for doing.

Accordingly, because of the reservations I have ex-

pressed about the dangers of assessing the value of legal services in order to impose disciplinary sanctions, I must dissent from the majority opinion.