In re Petition for DISCIPLINARY ACTION AGAINST John E. SIMMONDS, an Attorney at Law of the State of Minnesota.

No. C7–86–879.

Supreme Court of Minnesota.

Nov. 25, 1987.

William J. Wernz, Director, Phillip D. Nelson, Sp. Sr. Asst., Bd. of Lawyers Professional Responsibility, St. Paul, for appellant.

Fred Allen, Minneapolis, for respondent.

## OPINION

PER CURIAM.

Following a contested hearing on a petition filed by the Director of the Lawyers Professional Responsibility Board (LPRB) charging appellant John E. Simmonds with professional misconduct, a referee appointed by this court made findings of fact and conclusions of law essentially finding the allegations of the Director's petition to be true and holding that appellant's conduct had violated several disciplinary rules governing the conduct of lawyers admitted to practice in Minnesota. The referee recommended that appellant be suspended from the practice of law for six months; that thereafter he be placed on probation subject to certain conditions, not to be reinstated to unrestricted status until he had complied with those conditions. We affirm the findings and conclusions of the referee, and with modifications generally adopt her recommendations.

Appellant, an attorney at law admitted to practice in this state, for more than 30 years has maintained a law office and practice in Mankato. At times material to this matter he maintained residences in both Mankato and Minnetonka. His law prac-

tice primarily has been devoted to trial work, generally in the area of personal injury litigation.

In 1979 Susan Rottinghaus, upon the advice of an acquaintance, retained appellant by an oral contingent fee contract to represent her in her attempt to collect damages for disabling injuries she had sustained in a bar. During the course of a fight which had erupted between patrons in the bar, she had been pushed inadvertently over a railing and had fallen to the floor below. Appellant initiated an investigation of Rottinghaus's claim against the bar. He also was instrumental in making arrangements for her to receive medical treatment, including surgery, for her injuries. Additionally, appellant initiated proceedings to collect Rottinghaus's disability claim before the Social Security Administration.

In 1984 Rottinghaus's claim for disability payments under the Social Security Act was favorably resolved. The Social Security Administration notified her that approximately $1,570 would be withheld from the amount awarded and would be paid to appellant as attorney fees for services rendered in helping her process her claim unless the appellant, as her attorney, filed a waiver of those fees with the Social Security Administration. Appellant agreed to, and did, file a waiver of his fees, after which Rottinghaus received from the Social Security Administration an amount representing the attorney fees which the Social Security Administration had previously withheld. When she notified appellant that she had received the money, notwithstanding that he had previously filed the fee waiver, and although he knew that under social security regulations governmental approval was required for any subsequent payment of attorney fees,[1] appellant nonetheless demanded the money, insisting that payment be made in cash. In response to Simmonds' demand, Rottinghaus paid him in cash and personal property the sum of $1,050.

■ The referee concluded that appellant's conduct, in demanding and receiving from Rottinghaus money and property to satisfy his attorney fee claim against her, after he had filed a waiver of attorney fees in the social security matter, without first securing social security administration approval or consent, violated Minnesota Code of Professional Responsibility (MCPR) DR 1–102(A)(4) and (5) and DR 2–106(A).[2] The referee's conclusion comports with our holding in two prior cases. In *In re Beal*, 374 N.W.2d 715, 717–18 (Minn.1985) a lawyer had illegally requested fees directly from his client in excess of an amount approved by the Workers' Compensation Commission. We there held his conduct violated MCPR DR 2–106(A). Similarly, we held that an attorney's efforts to collect attorney fees in a workers' compensation matter which were in excess of a sum ordered by the Alaska Workers' Compensation Board, without the approval of that Board (Alaska law requires approval of lawyers fee agreement in a workers' compensation claim), violated, in part, MCPR DR 1–102(A)(4) and (5), and DR 2–106(A). *In re Hoffman*, 379 N.W.2d 514, 517 (Minn. 1986). In form and substance, Simmonds's conduct in demanding the fee differs in no respect from the conduct we condemned in *Beal* and *Hoffman*. We, therefore, concur in the referee's conclusion.

1. Under the governing federal statute, 42 U.S.C. § 406 (1982), lawyers are required to seek prior approval for attorney fees relating to social security proceedings. *See also* 20 C.F.R. §§ 404.-1700–404.1740 (1987). Collection of unapproved attorney fees is a misdemeanor pursuant to section 406. 42 U.S.C. § 406(b)(2) (1982).

2. The events giving rise to the charge in Count I of the petition took place prior to September 1, 1985 when the rules governing a lawyer's professional responsibility conduct were contained in the Minnesota Code of Professional Responsibility (MCPR).

DR1–102(A)(4) and (5) of that Code stated:
(A) A lawyer shall not:
\*   \*   \*   \*   \*
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
DR 2–106(A) of that Code stated:
(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

During the course of his investigation of Rottinghaus's personal injury claim against the bar wherein she sustained her injuries, appellant learned of the identity of Jeffrey Hansen, a person who might have information concerning the incident. Hansen resided in Hawaii. In May of 1984 appellant Simmonds took a trip to Hawaii. During his stay in Hawaii he took Hansen's statement. However, the referee was presented with conflicting accounts of the circumstances leading up to and surrounding the trip. The undisputed evidence indicates that Rottinghaus and appellant had discussed the desirability of ascertaining the substance of Hansen's testimony. Rottinghaus contended, however, that appellant told her that would be accomplished when Hansen came to Minneapolis in 1984, or by telephone, and the referee so found. The referee also found that appellant had contacted Hansen in the fall of 1983. Hansen had then informed appellant that he would be coming to Minneapolis in the spring of 1984. Notwithstanding, without first informing or securing the assent of his client, appellant spent approximately eight days in Hawaii, all but two of which were spent in the company of one of his personal friends engaging in activities unrelated to Rottinghaus's claim. While there he did take Hansen's statement, but prior to his arrival in Hawaii, he had made no arrangements to either meet with Hansen or take the statement. Ultimately he billed Rottinghaus for his round-trip airfare from Minneapolis to Honolulu, for airfare from Oahu to Maui (where Hansen lived) and back, for part of his lodging expenses incurred in Hawaii, miscellaneous expenses and attorney fees at the rate of $185 an hour for three days—for a total charge of $5,351.50. Appellant claimed the trip was necessary, that he couldn't rely on Hansen to come to Minneapolis, and that he had never taken a statement from a witness over the telephone.[3] Rottinghaus was un-

aware that appellant had gone to Hawaii until after he was already there.

On this conflicting evidence, the referee found that the primary purpose of appellant's trip was to take a personal vacation. Appellant does not seriously challenge the main referee findings on this point. Even though conflicting accounts of the circumstances occurring before and during appellant's Hawaii trip exist, when those referee findings, as here, are supported by the evidence, we will uphold them. We generally afford great weight to such findings. In re Schmidt, 402 N.W.2d 544, 545 (Minn. 1987). See also In re Nelson, 167 Minn. 467, 209 N.W. 316, 317 (1926). We likewise affirm the referee's conclusion that appellant's conduct in attempting to charge his client for expenses for a Hawaii trip for the purpose of taking a statement of a witness who appellant knew would be locally available soon thereafter violated MCPR DR 1–102(A)(4), DR 2–106(A) (1970).[4] For similar conduct in charging personal expenses to clients, we have imposed public discipline. See, e.g. In re Zimmerman, 380 N.W.2d 790 (Minn.1986).

In February of 1985, Rottinghaus terminated appellant's responsibilities as her attorney in pursuing her personal injury action. Following her request, Rottinghaus's file was ultimately delivered to another attorney.[5] Subsequently, appellant forwarded what he then denominated his "bill" to the substituted attorney in the total amount of $69,338.49 for legal services performed and expenses incurred on behalf of Rottinghaus. Simultaneously appellant asserted an attorney's lien against her personal injury action. The referee found that the submitted bill was clearly excessive in five respects.

The first exorbitance the referee found, in essence, was that in the bill appellant had charged and asserted a lien for services rendered and expenses in connection with the social security disability claim

---

3. In fact Hansen did come to Minneapolis in 1984, as he had informed appellant he would in 1983.

4. See, supra, footnote 2 for MCPR DR 1–102(A)(4) and DR 2–106(A) (1970).

5. Several months elapsed between the client's request and the appellant's delivery of the file to the client's newly retained attorney.

over and above that sum which had been paid to him by cash and property in 1984, even though, had appellant not filed a waiver as he did in the social security matter, his claim for attorney fees would have been limited to the portion of the claim approved by the Social Security Administration. The Social Security Administration had not given its approval to his claim for additional fees. Secondly, she found the fee claim in the bill to be excessive because the asserted lien included the expenses of appellant's trip to Hawaii, as well as his charge of $185 an hour for three days attorney time while he was there. Next, the referee found the bill and asserted lien included 32 hours of appellant's time at $185 an hour, four hours of another attorney's time at $125 per hour; 20 hours of legal assistant time at $25 per hour, five hours of bookkeeper/secretary time at $25 per hour, and 7.5 hours of receptionist time at $15 per hour, solely for the purpose of preparing time records on which the bill could be charged and the lien could be based. Fourthly, she found appellant had exorbitantly charged in the bill and included in the lien charges for all time spent by his office staff, including time spent preparing the time records—$1,404.50. Lastly, the referee found, in essence, that appellant's bill and asserted lien were excessive because they included charges for time spent at more than 35 conferences over a six-year period of time at various restaurants, at appellant's Minnetonka home, or at other Twin Cities locations, as well as mileage and travel expense incurred, whereas such alleged conferences were really essentially personal and social in nature, and seldom, if ever, involved appellant's work on the Rottinghaus personal injury claim. She also found that included in the bill and lien

was time allegedly spent by appellant in answering this ethics complaint.[6]

Appellant does not challenge these specific referee findings. Rather he contends that the "bill" presented to Rottinghaus's subsequent attorney was not, in the usual sense of the word, a "bill." Instead, he claims, that in view of his oral contingent fee arrangement, he could only recover the reasonable value of his services rendered, that the "bill" was actually a documentation to show the amount of work he and his staff had put into the Rottinghaus case, and the reasonable value of the time of each person who had contributed service. Additionally, he claims that for more than five years he not only rendered to Rottinghaus services in attempting to favorably resolve difficult legal issues, but that he had also assisted her in securing medical treatment for her injuries, and in otherwise advising her on personal and essentially nonlegal matters.

The referee, however, rejected those contentions. Even a casual examination of the "bill" submitted casts considerable doubt as to the validity of appellant's assertions. When disputed fact questions exist, this court affords great weight to the referee findings. *In re Schmidt*, 402 N.W.2d 544, 545 (Minn.1987). In resolving disputed factual issues, a referee by necessity must make credibility determinations. From our examination of the relevant part of the record we conclude that the referee's findings were well supported by credible evidence. Those findings led the referee to conclude that appellant's conduct in overcharging fees violated Minnesota Code of Professional Responsibility DR 2–106(A) and (B), in effect prior to September 1, 1985 and Rule 1.5(a) of the Minnesota Rules of Professional Conduct thereafter.[7]

---

6. Appellant disputed this, and while the record is not completely clear, it seemingly supports the referee's finding.

7. Minnesota Code of Professional Responsibility DR 2–106(A), (B) (1970) states:
   (A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
   (B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm

conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
   (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
   (2) The likelihood, if apparent to the client, that the acceptance of the particular employ-

In several Minnesota disciplinary cases, wherein an attorney has been found to have charged clients excessive or illegal fees, this court has held that such a finding provided a basis for imposing discipline, depending on the egregiousness of that conduct, ranging from public reprimand, *In re Doherty*, 374 N.W.2d 721 (Minn.1985); to suspension, *In re Dillon*, 371 N.W.2d 548 (Minn.1985); or, when charging excessive fees was one of several acts of misconduct, to disbarment. *In re Franke*, 345 N.W.2d 224 (Minn.1984). Other jurisdictions likewise consider that charging of excessive fees violate rules of professional conduct subjecting the attorney to sanctions following disciplinary proceedings. *See, e.g., In re Kutner*, 78 Ill.2d 157, 35 Ill.Dec. 674, 399 N.E.2d 963 (1979); *In re Greer*, 61 Wash.2d 741, 380 P.2d 482 (1963).

▆▆▆ After careful consideration of the appellant's claim, we affirm all of the referee's findings and conclusions. Clearly those affirmed findings warrant public discipline. Based upon her findings of fact and conclusions of law, the referee recommended that appellant be suspended from the practice of law for six months and thereafter be placed upon probation until such a time as he satisfies certain conditions including (a) no further violations of the Minnesota Rules of Professional Conduct, (b) restitution to Rottinghaus of the alleged fees received from her on the social security matter, (c) submission of a redrafted bill and lien on Rottinghaus's personal injury action excluding inappropriate and excessive charges previously claimed, and (d) successful completion of the Multi-state Professional Responsibility Examination. The referee's recommended sanction is based primarily on appellant's dishonesty (MCPR DR 1–102(A)(4)), conduct prejudicial to the administration of justice (MCPR DR 1–102(A)(5)) and his assertion of entitlement to excessive and illegal fees (MCPR DR 2–106(A), (B); MRPR 1.5(a)). While this court traditionally affords great weight to a referee's recommendation, we have repeatedly acknowledged the final responsibility for determining appropriate discipline rests with this court. *In re Fling*, 316 N.W.2d 556, 559 (Minn.1982), *In re Daly*, 291 Minn. 488, 490, 189 N.W.2d 176, 179 (1971). Therefore, on occasion, we find it appropriate to depart from a referee's recommendation. *See, e.g., In re Wareham*, 413 N.W.2d 820 (Minn.1987). In exercising our ultimate responsibility to formulate an appropriate discipline, we weigh the nature of the misconduct, the cumulative weight of the disciplinary rule violations, and the potential harm to the public, the profession and to the legal system. *In re Agnew*, 311 N.W.2d 869, 872 (Minn.1981); *In re Franke*, 345 N.W.2d 224, 228 (Minn.1984).

Appellant argues that the referee's recommendation is "severely harsh in view of the facts and circumstances in this case," and suggests, at most, that a private reprimand be considered on the social security

ment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent. Minnesota Rules of Professional Conduct Rule 1.5(a) (1985) states:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

fee matter.[8] The appellant's misconduct arose out of his relationship with a single client. The referee findings and the record support the conclusion that at the initiation of that relationship the client was desperate and, as the result, vulnerable. While undoubtedly appellant did render her advice and arrange to alleviate some of her concerns as well as her physical problems, he nonetheless, on the whole, took advantage of the situation by charging her excessive and illegal fees as well as incurring and charging to her unnecessary and unreasonable expenses incurred primarily for his own pleasure. As the cases cited in the opinion clearly indicate, this type of activity by a lawyer in placing his own interest above that of the client merits severe public discipline. *See In re Hoffman,* 379 N.W.2d 514, 519 (Minn.1986).

Were the type of conduct engaged in by appellant tolerated, the potential harm to the public would be impermissible, resulting certainly, in the erosion of the public's confidence in the integrity of the profession.

We concur in the referee's general recommendation that appellant be temporarily suspended for a period of time after which he be placed on probation subject to certain conditions. However, insofar as the record reveals in this case, the overreaching of the client in this case appears to be an isolated instance in a lengthy career in the practice of law without any serious call for imposition of sanctions for any claimed misconduct on the part of the appellant[9]—espe-

cially for overreaching or taking advantage of a vulnerable client. Therefore, we believe that an absolute suspension from the practice of law for a period of three months to be followed by probation would be adequate under the circumstances of his relationship with the client here existing. During the probationary period, of course, appellant shall commit no violation of the Minnesota Rules of Professional Conduct. He shall likewise make restitution to Ms. Rottinghaus of the illegal fees he has received from her in Social Security matters. In connection with his claim for expenses and fees in representing Ms. Rottinghaus in both matters, he shall prepare a statement excluding the items found by the referee to be illegal, inappropriate and excessive.[10] Appellant shall not be reinstated to the practice of law, even in probationary status until he has furnished this court with evidence of compliance with Rule 26, Rules on Lawyers Professional Responsibility (RLPR); nor shall he be reinstated to unrestricted practice of law until he shall have complied with Rule 18(e) RLPR and furnished evidence of that compliance as well as payment of $750 in costs provided in Rule 24 RLPR.

It is so ordered.

POPOVICH, J., took no part in the consideration or decision of this case.

---

**8.** Additionally appellant seeks a new hearing before the referee claiming that the referee denied him a fair hearing when she refused appellant's request to examine a witness, and refused appellant's offer of proof in connection with his request. He likewise claimed the referee had engaged in other alleged misconduct. We have examined appellant's contentions on these issues and find them all to be meritless.

**9.** The referee did find that appellant had failed to forward Rottinghaus's file to her successor attorney, after the client had terminated his services, for approximately five months. The referee also found that in 1980 appellant had received a warning letter from the Lawyers Board of Professional Responsibility for a similar failure to surrender the file to a successor attorney in a timely matter.

**10.** Since appellant's representation of Ms. Rottinghaus was on a contingent fee basis, we appreciate that any recovery of claimed fees will be on a quantum meruit basis. Thus, the so-denominated "bill of charges" is legally of no effect except to support appellant's assertion of the reasonable value of services rendered to the client up until the time of the dismissal in his own opinion. Thus, it is binding neither upon Ms. Rottinghaus nor any successor counsel representing her. Moreover, by ordering exclusion of certain claimed costs from the "bill" we by no means imply the remaining charges for expenses or claimed fees are either valid or reasonable. We only intend that appellant may not assert a claim for those items which have been found to be illegal, inappropriate or excessive.